UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-24070-Civ-SCOLA

IKE FRANCIS

       Plaintiff,

vs.

JONATHAN SILVA, *et al.*,

       Defendants.

_____/

## ORDER GRANTING INDIVIDUAL FEDERAL DEFENDANTS' MOTION TO DISMISS

This action stems from an assault allegedly committed by the employee of a private contractor. The contractor, Doyon/Akal JV I, provided detention services for an immigration detention center (Krome) owned by Immigration and Customs Enforcement (ICE), an agency of the federal government. Plaintiff Ike Francis sued three groups of defendants: the United States government, individual federal defendants, and private defendants. This Order deals with the claims asserted against the individual federal defendants.

Francis contends that these defendants violated his Fourth and Fifth Amendment rights, and he seeks to recover damages under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). These defendants move to dismiss, arguing that Francis cannot pursue a constitutional-tort claim against them under *Bivens* and that they are entitled to qualified immunity. For the reasons set forth below, the Court grants their Motion to Dismiss (DE 100). Specifically, the Court concludes that a *Bivens* remedy exists in these circumstances, but that the ICE Employees are entitled to qualified immunity.

### BACKGROUND

Francis is a Jamaican immigrant who was held for a year and a half in civil immigration detention at Krome Service Processing Center (Krome) in Miami, Florida. (DE 74 at 2.) He alleges that on March 6, 2010, he was beaten by detention officer Jonathan Silva in an empty elevator room in Krome that had no camera surveillance. (*Id.* at 2-3.)

In November 2011, ten months after being released from Krome,[1] Francis filed this suit seeking damages and declaratory and injunctive relief against the United States, ICE Employees, and various private individuals and corporations that the Plaintiff alleges participated in the attack or allowed it to occur.  The individual federal defendants consist of the following six ICE employees: Acting Field Office Director (FOD) Michael Meade; Supervisory Detention and Deportation Officer (SDDO) Eduardo Roman; Contracting Officer's Technical Representative Luis Cabarcas, Felix Garnett, and Luis Jimenez; and Alternate COTR Liana Castano.  Francis alleges that these six individuals (hereafter, the "ICE Employees") violated his Fourth and Fifth Amendment rights to be free from excessive force.

## ANALYSIS

### A.    Is Francis's Bivens claim viable?

The first issue is whether Francis is entitled to pursue a constitutional-tort claim under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  In *Bivens*, the Supreme Court held that there was an implied claim for money damages against federal agents alleged to have violated someone's constitutional rights.  403 U.S. at 397.  The ICE Employees argue that no similar *Bivens* claim exists against them for two reasons: (1) Francis seeks to improperly extend *Bivens* liability to an "entirely new and unprecedented context—[namely,] against noncustodial contract managers tasked with implementing a government contract," and (2) Francis's state-law tort claims against the Private Defendants provide an adequate alternative remedy for his alleged injuries, so there is no need to imply a cause of action for him based on the constitution.  (DE 100 at 7-10.)  Each argument is considered in turn.

The ICE Employee's first argument is unpersuasive.  Francis contends that his claim against the ICE Employees is "based on well-established theories of *Bivens* liability for government officials whose supervisory actions or omissions have a causal connection to a supervisee's use of excessive force."[2]  (DE 114 at 13-14.)  The premise of Francis's rejoinder is

---

[1] Francis was released from Krome when an immigration judge stopped his deportation proceedings by granting him deferral of removal under the Convention Against Torture on account of his sexual orientation (homosexual) and the country conditions in Jamaica. (DE 74 at 2.)

[2] Although Francis brought *Bivens* claims against the ICE Employees under both the Fourth and Fifth Amendments (DE 74 at 38-41), he expressly abandons his claims under the Fourth

correct: the Eleventh Circuit has recognized that "[s]upervisors can be held liable under *Bivens* when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiffs, and his conduct was causally related to the constitutional violation committed by his subordinate."  *E.g. Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (brackets and internal quotation marks omitted).  So the issue underlying the ICE Employee's first argument becomes who correctly characterizes Francis's *Bivens* claim, Francis or the ICE Employees.  Francis characterizes the claim as a supervisory *Bivens* claim; in other words, he contends that the ICE Employees in a legal sense caused Francis's injuries by instituting policies that allowed Silva to attack Francis, by failing to protect detainees from physical attacks by contract detention officers even though the ICE Employees knew they needed to protect detainees from these type of attacks due to a history of widespread abuse at Krome, or by failing to protect Francis from Silva's specific attack even though they knew in advance that Silva had specifically threatened to attack Francis on March 6.  (DE 114 at 14-15); *Reno*, 325 F.3d at 1234-35 (holding that the causal connection required for supervisory liability under *Bivens* "can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, . . . when the supervisor's improper custom or policy resulted in deliberate indifference to constitutional rights, [or when there are] facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so" (ellipses, internal citations, and internal quotation marks omitted).  And this characterization is consistent with his allegations in the Complaint.  (*See* DE 74 at 2-3, 9-11, 13-15, 17-28, 33-35, 38-41.)   The ICE Employees, on the other hand, characterize the claim as being asserted not against supervisors, but rather "against noncustodial contract managers tasked with implementing a government contract" for injuries caused by administering the contract poorly.  (DE 100 at 9.)

---

Amendment (DE 114 at 15 n.1.)  This makes sense because the Due Process Clause of the Fifth Amendment "controls excessive force claims brought by federal immigration detainees" like Francis.  *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010).  Although the ICE Employees argue that a *Bivens* remedy is not available for Francis's excessive-force claim, they do not argue that this is so because Francis brings his claim under the Fifth Amendment rather than the Fourth Amendment.  (DE 100 at 5-11.)  The Court therefore need not decide what bearing the Fifth Amendment has on the availability of a *Bivens* remedy.

This characterization stems from the ICE Employees reading the contract between ICE and Doyon/Akal (Contractor) as specifying (a) that the Contractor is responsible for supervising its detention officers and the detention services and (b) that the role of the ICE Employees is essentially limited to administering the technical aspects of the contract. (DE 100 at 2-4.) While some language in the contract supports this interpretation, other language provides a broader role for the ICE Employees that mirror supervisory functions:

- "ICE Inspectors will conduct periodic unscheduled inspections of the facilities to assure compliance [with] the aforementioned standards." (DE 100-1 at 3.)[3] The titles of these standards strongly suggest that they are comprehensive and include standards governing how detention should be properly effected. (*See id.*)  Given that the contract itself has sections specifically devoted to properly supervising detainees, using restraints, and using force (*id.* at 53-54, 58; DE 100-2 at 2) it seems more than plausible to assume that the "aforementioned standards" cover these topics as well.

- "Supervisory Detention Officers[4] shall work closely with the COTR and ICE officials throughout each work shift, to ensure coordination of all Contractor activities with ICE priorities." (DE 100-1 at 14.)

- The Project Manager[5] "shall . . . meet at least weekly with the COTR to receive Contractor performance and plan improvements." (DE 100-1 at 14-15.)

- "The Contractor shall report all violations or attempted violations of the standards of [employee] conduct or any criminal activity [by Contractor employees] immediately to the COTR.  Violations may result in employee removal from the facility."[6] (DE 100-1 at 32.)

---

[3] Because Francis refers to the contract in his Complaint (DE 74) and because the contract is central to his claims, the Court may consider the contract without converting the present motion to dismiss into a motion for summary judgment. *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

[4] Supervisory Detention Officers are Contractor employees who directly supervise Contractor detention officers like Silva. (DE 100-1 at 14-16.)

[5] The Project Manager is the "Contractor employee responsible for on-site supervision of all Contractor employees, with the authority to act on behalf of the Contractor." (DE 100-1 at 8.) During the relevant time period, the Project Manager was Defendant Laynard Owens. (DE 74 at 3-4.)

[6] In the contract, the word *employee* "refers to a person employed by the Contractor." (DE 100-1 at 6.)

- "ICE may direct the Contractor to remove any employee who has been disqualified either for security reasons or for being unfit to perform his/her duties as determined by the COTR or the Contracting Officer.[7]  The Contractor shall take action immediately and notify the COTR when the employee is removed from duty.  A determination of being unfit for duty may be made from, but is not limited to, . . . [v]iolations of security procedures or regulations."  (DE 100-1 at 37.)

- "At the direction of the COTR, the Contractor shall reassign contract employees who have been arrested or who have alleged misconduct to duties that do not permit direct contact with detainees pending the disposition of the charges.  Any alleged misconduct shall be reported immediately to the COTR.  If such reassignments are not available, the Contractor shall remove the employee from work under this contract and other ICE contracts."  (DE 100-1 at 38.)

- The use of force policy provides that all uses of force be reported to the ICE supervisor on duty immediately and to the COTR within 24 hours.  (DE 100-2 at 2.)

Based on this language and the Complaint's allegations, which are consistent with how Francis characterizes his claim (*see* DE 74 at 2-3, 9-11, 13-15, 17-28, 33-35, 38-41), Francis characterizes his claim correctly.  Francis's claim therefore fits within the recognized theory that supervisors can be liable under *Bivens* for their own conduct.  *See Reno*, 325 F.3d at 1234.  The ICE Employee's first argument against concluding a *Bivens* remedy exists in this case fails.

Turning to the second argument, the ICE Employees argue that because Francis's state-law tort claims against the Private Defendants provide an adequate alternative remedy for his alleged injuries, there is no need to imply a cause of action for him based on the constitution.  If another source of law provides an adequate alternative remedy for protecting the constitutional interests at stake, then there is no need to imply a *Bivens* action.  *Minneci v. Pollard*, 132 S. Ct. 617, 621, 623, 625 (2012).  An alternative remedy is adequate if, in comparison to a potential *Bivens* action, it "provide[s] roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations. *Id.* at 625.  In other words, an alternate remedy is adequate if it provides similar compensation and deterrence as a *Bivens* claim.  *Id.*

---

[7] The Contracting Officer is an "ICE employee empowered to award, amend, administer, and terminate contracts."  (DE 100-1 at 4.)

The reasoning of *Minneci* demonstrates that there is not an adequate alternative remedy with respect to the ICE Employees in the present case. In *Minneci* (the case the ICE Employees' principally rely on to advance their second argument), the Court declined to imply a *Bivens* action against "privately employed personnel working at a privately operated federal prison" for allegedly violating the Eighth Amendment by depriving Pollard of adequate medical care. *Id.* at 626. The Court reasoned that the prisoner Pollard could bring state-law tort claims against the private employees, and that when compared to a potential *Bivens* action, these state-law remedies were adequate because they provided roughly the same compensation to Pollard and because they incentivized the defendants to comply with the constitution to roughly the same extent. *Id.* at 625. That an alternative remedy needed to deter constitutional violations to be adequate was underscored by the manner in which *Minneci* distinguished *Carlson v. Green*, 446 U.S. 14 (1980), which held that there was a *Bivens* action against federal-government personnel in federal prisons for the same allegedly unconstitutional conduct (i.e., violating the Eighth Amendment by depriving the prisoner of adequate medical care). *Id.* at 622-23. The different employment status in the two cases—private employee in *Minneci* and federal-government employee in *Carlson*—explained the divergent holdings. *Id.* at 623. Prisoners could bring state-law tort claims against the private employees in *Minneci*, but they could not ordinarily bring those same claims against the federal-government employees in *Carlson* because provisions in the FTCA immunize federal-government employees from tort liability.[8]  *Id.*  Significantly, plaintiffs in the *Carlson* factual situation would still have a FTCA tort claim against the United States, which would provide them with an alternate means of compensation. *Id.*; *Carlson*, 446 U.S. at 20-21. But unlike Pollard in *Minneci*, these plaintiffs would not have a claim against the person who actually violated their constitutional rights and thus would not have a remedy with the same deterrent effect as a *Bivens* claim. *Minneci*, 132 S. Ct. at 622-23; *Carlson*, 446 U.S. at 20-21 (holding that a *Bivens* claim was proper even when a FTCA claim was available against

---

[8] The FTCA accomplishes this by mandating that when a federal-government employee commits a tort "while acting within the scope of his office or employment," the "exclusive" remedy is to sue the United States—not the employee—for that tort. 28 U.S.C. § 2679(b)(1). So if a tort action is launched against such an employee in federal court, the United States must be substituted as the defendant; and if the action is launched in state court, then the action must be removed to federal court and the United States is again substituted as the defendant. *Osborn v. Haley*, 549 U.S. 225, 238, 241 (2007).

the United States because allowing recovery against the officer provides a stronger deterrent effect than recovering from the government itself).

Just as the availability of a tort claim against the United States in *Carlson* was found inadequate because it did not provide the same deterrence as a *Bivens* claim, Francis's state-law tort claims against the Private Defendants are similarly inadequate because those claims do not deter the ICE employees as well as a *Bivens* claim would. "It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." *Carlson*, 446 U.S. at 21 (internal citations omitted). Because Francis's state-law tort claims against the Private Defendants do not provide an adequate alternative remedy to a *Bivens* claim against the ICE Employees, their second argument fails as well. The Court therefore holds that Francis is entitled to pursue a *Bivens* action against the ICE employees.

**B.      Are the ICE Employees entitled to qualified immunity?**

The qualified-immunity doctrine completely protects government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006). To be protected by qualified immunity, government officials must show that they were exercising their discretionary authority when the allegedly wrongful acts occurred. *Id.* This threshold requirement is not contested here: Francis alleges in his complaint that the ICE Employees were performing discretionary functions. (DE 74 at 41.) So the burden shifts to Francis "to show that qualified immunity is not appropriate." *Matthews v.* Crosby, 480 F.3d 1265, 1269 (11th Cir. 2007). The ICE Employees are entitled to qualified immunity unless the facts that Francis has alleged—viewed in the light most favorable to Francis—show that (1) the ICE Employees violated a constitutional right and (2) the right was clearly established. *See Williams v. Santana*, 340 F. App'x 614, 616-17 (11th Cir. 2009). Courts can analyze either prong first. *Pearson v. Callahan*, 555 U.S. 223, 241-43 (2009).

Before turning to the prongs, the Court sets forth the pleading standard governing the ICE Employees' motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. When considering a motion to dismiss under Rule 12(b)(6), the Court must accept all of the Complaint's well-pled factual allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading need only contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Though the Rule does not require detailed factual allegations, it does require "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets, internal citation, and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* So a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will be dismissed. *Id.*

In applying the Supreme Court's directives in *Twombly* and *Iqbal* to a motion to dismiss, the Eleventh Circuit has instructed that

> a court should 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Further, courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (brackets, internal citations, and quotation marks omitted). The plausibility standard of *Twombly* and *Iqbal* "applies to all civil actions." *Id.*

**1.    *Was a constitutional right violated?***

"Supervisors can be held liable under *Bivens* when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiffs, and his conduct was causally related to the constitutional violation committed by his subordinate."[9]  *E.g. Reno*, 325 F.3d at 1234 (brackets and internal quotation marks omitted).

---

[9] The Complaint's allegations show that Silva (the alleged subordinate) violated Francis's right to be free from excessive force under the Fifth Amendment's Due Process Clause. *See Porro*, 624 F.3d at 1326 (holding that the Due Process Clause of the Fifth Amendment "controls excessive force claims brought by federal immigration detainees). A pretrial detainee's claim that his rights under the Due Process Clause were violated is analyzed using the same standards as an inmate's claim that his rights under the "Eight Amendment's Cruel and Unusual Punishment Clause" were violated. *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005). Under this standard, whether a "prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or

Significantly, supervisors "are not liable under *Bivens* for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Id.* (brackets and internal quotation marks omitted).

The standard for holding supervisors liable in their "individual capacity for the actions of a subordinate is extremely rigorous." *Id.* Supervisors are liable "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Id.* (internal quotation marks omitted). It is undisputed that the ICE Employees did not personally participate in Silva's beating Francis. So the issue becomes whether the ICE Employees' conduct is causally connected to the beating.

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006).[10] "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences. *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Francis contends that his allegations establish the causal connection under all three prongs of *Valdes*. (DE 114 at 20-21.) Because the allegations against the ICE Employees vary with their job at ICE, the Court considers groups them together based on their jobs.

a.      *Acting Field Office Director Michael Meade*

Francis argues that Meade's conduct was causally connected to Silva's attacking Francis (hereafter, "the Attack") because (1) there was a history of widespread detainee abuse that

---

maliciously or sadistically for the very purpose of causing harm. *Id.* (internal quotations omitted). Francis alleges that Silva did not attack him not to maintain order; Silva instead attacked Francis because Francis had reported Silva's threats to attack him and because Silva was hostile towards homosexuals. (DE 74 at 24-25, 28-29.) Assuming the truth of those allegations, Francis states a valid excessive-force claim under the Fifth Amendment.

[10] *Valdes* involved a claim brought under 42 U.S.C. § 1983 rather than *Bivens*. *Id.* at 1236. But the standards for both claims are the same because *Bivens* "is the federal analog to suits brought against state officials under . . . § 1983." *Iqbal*, 556 U.S. at 675-76.

notified him of the need to take action, but he failed to, and (2) Meade's inadequate policies and customs resulted in deliberate indifference to Francis's constitutional rights.  (DE 114 at 39-40.)

The Court first reviews his well-pled factual allegations with respect to claims of widespread abuse.  Francis alleges that a Freedom of Information Act (FOIA) response he received from ICE shows that Meade and the other ICE Employees "were aware of at least 29 reports of physical or sexual abuse by contract or ICE guards against detainees between September 2008 and March 6, 2010."  (DE 74 at 6.)  The FOIA response also showed that ICE had received a whistleblower letter,[11] which documented five separate incidents of detainee abuse and alleged that certain ICE and Contractor officers (the names have been blacked out) were being protected in connection with the abuse.  (*Id.* at 6, 17-18.)  Though Francis does not expressly allege that Meade was aware of this letter, if a practice is widespread, then a "court [can] infer that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."  *Cf. Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995) (reasoning that a municipality can be held liable under § 1983 even absent a written policy if the plaintiff can establish a "persistent and widespread practice"); *accord Lannen v. Broward County Sheriff's Office*, Case No. 10-cv-61311, at *3 (S.D. Fla. March 21, 2013) (Scola, J.).  And Francis alleges that Meade is the federal official that oversees Krome and all the policies at the facility.  (DE 74 at 4.)  It seems plausible that the federal official in charge of a facility would have learned about a whistleblower letter alleging detainee abuse when that official was already aware of 29 reports of detainee abuse occurring over a year and a half period.  *See Williams*, 340 F. App'x at 618 (holding that a supervisor had notice of widespread abuse when the supervisor knew that eight complaints had been lodged against a specific officer in a four-year period).

But the problem for Francis is that to notify Meade of the need to act to prevent the specific harm inflicted in this case, Francis must allege facts establishing that Meade knew that Silva had been repeatedly accused of detainee abuse.  *See Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, (3d Cir. 2011) ("[T]he typical "notice" case seems to involve a prior incident or incidents of misconduct by a specific employee or group of

---

[11] The letter was signed "Concern[ed] Maintenance Department, Officers and public health service medical staff."  (DE 74 at 17.)

employees, specific notice of such misconduct to their superiors, and then continued instances of misconduct by the same employee or employees."); *Wickers v. Utsey*, 2008 WL 4999247, at *6 (N.D. Fla. Nov. 20, 2008) ("Although Plaintiff generally alleges that some "police officers" have been repeatedly accused of using excessive force, Plaintiff has offered no facts in support of this allegation, and in particular, Plaintiff has not alleged that Defendant Utsey has been repeatedly accused of excessive force, that Defendant Hall was aware of such allegations against Defendant Utsey, and that Defendant Hall failed to take any corrective action after being advised of Defendant Utsey's repeated misconduct.").  But Francis alleges only one other incident where a detainee filed a grievance against Silva for allegedly using excessive force before Silva beat Francis.  (DE 74 at 23-24.)  And though his mechanism for Meade learning about this incident is plausible—Francis alleges that if the ICE/DRO Detention Standards were followed, then Meade learned of this incident, and it seems plausible to presume that policies are usually followed[12]— one allegation against Silva from almost a year earlier is not sufficient to notify Meade of the need to prevent Silva from coming into contact with detainees.  *See Williams*, 340 F. App'x at 618 (reasoning that a supervisor knowing of eight prior allegations that the same officer had used excessive force constituted sufficient notice to take corrective action with respect to that officer).

Francis's other theory for Meade's conduct being causally connected to the Attack is that Meade's alleged policy of not "requiring camera surveillance in *all* areas where detention officers would supervise detainees without surveillance" resulted in deliberate indifference to the constitutional right to not be subjected to excessive force.  (DE 114 at 33-34 (emphasis added).)  While Francis's allegations about widespread detainee abuse at Krome are somewhat relevant to this theory of causation, Francis must establish that not having enough cameras contributed to this abuse to such an extent that the decision to not require them was reckless conduct.  *See Thomas v. Bryan*, 614 F.3d 1288 ("[T]o find deliberate indifference on the part of a prison official, a plaintiff inmate must show: (1) subjective knowledge of a risk of serious harm; (2)

---

[12] The ICE Employees take issue with Francis alleging on "information and belief" that Meade was aware of the grievance filed against Silva; the ICE Employees contend this is not a proper factual allegation under Rule 8 because it is made on only "information and belief."  (DE 100 at 22.)  They are mistaken: "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible."  *Associated Industries Ins. Co., Inc. v. Advanced Management Services, Inc.*, 2013 WL 1176252, at *3 (S.D. Fla. March 20, 2013 ) (Marra, J.) (internal quotation marks omitted).

disregard of that risk; (3) by conduct that is more than gross negligence.")  He attempts to do this by alleging that most of the approximately 25 detainee grievances relating to physical abuse filed between September 2008 and March 2010 do not refer to video footage, which he claims indicates that the assaults likely took place in areas with no cameras.  (DE 74 at 20.)  But this allegation is too speculative because there are obvious alternative explanations that do not support the inference he asks the court to draw.  *Kivisto*, 413 F. App'x at 138 ("Further, courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.").  Just because grievances don't refer to video footage does not mean the footage does not exist.  Francis does not allege that grievances typically refer to video footage if it exists.

Because neither of the causation theories Francis asserts for Meade's conduct satisfy the pleading standard, Francis has not shown that Meade violated a constitutional right.  He is therefore entitled to qualified immunity and must be dismissed from this case.

b.      *Supervisory Detention and Deportation Officer Eduardo Roman*

Francis argues that Roman's conduct was causally connected to the Attack because (1) Roman knew that Silva would attack Francis and yet he failed to stop it, (2) there was a history of widespread detainee abuse that notified him of the need to take action, but he failed to, and (3) Roman's inadequate policies and customs resulted in deliberate indifference to Francis's constitutional rights.  (DE 114 at 25-28.)

With respect to Francis's first causal-connection theory, he has alleged facts plausibly supporting the inference that Roman knew Silva planned to attack Francis before the attack occurred.  He alleges that on March 5, 2010, he told two ICE officers that Silva had told him that Silva would attack him the next day.  (DE 74 at 25.)  One of these officers told Roman, and a March 8 email from Roman shows that he in turn told the Contractor Project Manager, Laynard Owens, about Silva's threat.  (*Id.* at 26; DE 100-4 at 2-3.)  In the email, Roman asks Owens why Silva was allowed to have further contact with Francis after Roman told Owens about Francis's allegation that Silva wanted to fight.  (DE 100-4 at 2.)[13]

---

[13] As with the contract between ICE and the Contractor, the Court may consider this email on a motion to dismiss under Rule 12 because Francis refers to the email in the Complaint and the email is central to his claims.  *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

Though Francis has plausibly alleged that Roman knew Silva planned to attack, Francis has failed to show that Roman's response gives rise to a constitutional tort. The email shows that Roman told Owens—the "Contractor employee responsible for on-site supervision of all Contractor employees, with the authority to act on behalf of the Contractor" (DE 100-1 at 8)—so that Owen, as Silva's supervisor, could prevent Silva from having contact with Francis until the allegation could be investigated (DE 100-4 at 2). To be sure, Roman failed to follow the ICE/DRO Detention Standards by not immediately reporting the allegation to an ICE superior. (DE 74 at 34.) But failing to strictly comply with an agency's policies does not by itself constitute a constitutional tort. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.") Moreover, Roman's failure to comply with the policy did not proximately cause Francis's injury. Roman's constitutional duty to Francis was satisfied by relaying the allegation to Owens and advising that Silva should not have contact with Francis until the allegation could be investigated. *See Danley*, 540 F.3d at 1315 ("[S]upervisors are liable for the excessive force . . . of their employees where the supervisors received numerous reports of prior misconduct of that nature by those same employees and *did nothing to remedy the situation*." (Emphasis added.)).

Francis's argument that Roman should have instructed the Contractor to fire Silva is also unpersuasive. Although the Complaint does allege that Roman supervised Contractor detention officers like Silva (DE 74 at 10-11), the contract authorizes the COTR—not a SDDO—to require that the Contractor to reassign or terminate one of its employees (DE 100-1 at 36-38). But even if Roman did have the power, he would not violate the constitution by failing to get a Contractor employee terminated on the basis of an *allegation* by a detainee.

Also unpersuasive is Francis's argument that Roman knew about the impending March 6 attack days before it happened. Silva did threaten Francis before March 5, but that earlier threat did not contain a date on which Silva would§ attack. (DE 74 at 25.) And contrary to what Francis asserts, the Contractor employee that Francis told about that earlier threat was not required by the contract to tell Roman. (DE 100-1 at 32.)

Francis's second causal-connection theory—that the widespread detainee abuse put Roman on notice of the need to correct the rampant Fifth Amendment violations, which Roman failed to do—also fails. For the reasons stated earlier, Francis plausibly alleges that detainee

abuse at Krome was widespread and that Roman knew it (for example, he alleges that Roman too was aware of 29 reports of detainee abuse at the hands of Contractor or ICE staff).  (*See* DE 74 at 6-7.)  But he does not plausibly allege that Roman failed to take action.  His complaint instead establishes that when Roman first learned that Silva may attack Francis, Roman took immediate and appropriate action to try to prevent the attack.  Roman's unspecified failure to take other action in the face of allegedly widespread detainee abuse did not proximately cause Francis's injury.

Francis's third causal-connection theory—that Roman violated Francis's rights "by creating and maintaining improper customs and policies" (DE 74 at 40)—is quickly dispatched. This claim fails because Francis alleges that only Meade had policymaking authority.  (*Id.* at 4, 9.)

c.      *Contracting Officer's Technical Representatives (COTR) Luis Cabarcas, Felix Garnett, and Luis Jimenez, and Alternate COTR Lian Castano*

Francis argues that these defendants (collectively, "the COTR Defendants") conduct was causally connected to the Attack because (1) they knew that Silva would attack Francis and yet they failed to stop it, (2) there was a history of widespread detainee abuse that notified them of the need to take action, but they failed to, and (3) their inadequate policies and customs resulted in deliberate indifference to Francis's constitutional rights.  (DE 114 at 25-28.)

Although Francis argues that the COTR Defendants knew about Silva's specific threat to attack Francis before it happened, no well-pled factual allegation supports that argument.  His first causal-connection theory fails.  And his third theory fails too because Francis alleges that only Meade had policymaking authority.  (DE at 4, 9.)

But his second theory has merit.  Francis alleges that a Freedom of Information Act (FOIA) response he received from ICE shows that the COTR Defendants, as well as the other ICE Employees, "were aware of at least 29 reports of physical or sexual abuse by contract or ICE guards against detainees between September 2008 and March 6, 2010."  (DE 74 at 6.)  The plausibility of the allegation that the COTR Defendants were aware of these 29 reports is buttressed by the contract itself, which provides that all uses of force by staff be reported to the COTR within 24 hours and that any alleged misconduct must be reported to the COTR immediately.  (DE 74 at 13; DE 100-1 at 38; DE 100-2 at 2.)  Almost 30 reports of detainee abuse in a year and a half can plausibly be described as widespread.  *See Williams*, 340 F. App'x

at 618 (holding that eight prior reports of an officer using excessive force constituted notice of widespread abuse even though the court knew that only one of the reports was substantiated and did not know the fate of the other seven).  The ICE Employees counter that the number of complaints has nothing to do with their validity.  *See* DE 100 at 21; *West v. Tillman*, 496 F.3d 1321, 1329; *Gold v. City of Miami*, 151 F.3d 1346, 1351.  True enough, but there is some evidence substantiating some of the claims.  Francis alleges that one of these complaints was investigated by an ICE enforcement agent, who issued a report concluding that "it was more likely than not that the officers acted inappropriately and further action against them should be considered."  (DE 74 at 22 (internal quotation marks omitted).)  And one of the incidents described in the whistleblower letter was also reported in writing by a detainee, which suggests that there is something to this claim as well.  (*Id.* at 17-18.)  Still another report of detainee abuse was signed by 26 detainees.  So there are factual allegations supporting the validity of at least some of these claims.  If eight reports of excessive force by an officer—only one of which had been substantiated—was enough to put the supervisor on notice of misconduct that was sufficiently obvious, flagrant, rampant, and of continued duration to require the supervisor to act," *Williams*, 340 F. App'x at 618, then certainly 29 reports of detainee abuse—one of which was investigated and substantiated, and two of which are supported by circumstantial evidence—also constitutes a history of widespread abuse sufficient to put a responsible supervisor on notice.

Moreover, the COTR Defendants were plausibly aware of the excessive-force grievance against Silva because if the contract was followed (a plausible inference), then the COTR was informed of this incident within 24 hours.  (DE 100-1 at 38; DE 100-2 at 2.)  Because Francis's allegations and the contract both support the conclusion that a COTR has the authority to require the Contractor to reassign or terminate one of its employees (DE 100-1 at 36-38), it follows that the COTR Defendants are in a position to take meaningful action in the face of widespread detainee abuse, which runs afoul of several provisions in the contract that they are authorized to administer.  The Complaint alleges that they failed to take action to address the widespread detainee abuse.  Francis therefore has plausibly alleged that the conduct of the COTR Defendants is causally connected to Silva's beating him.  This in turn means that he has alleged that they violated his constitutional rights.  The Court therefore proceeds to the second step of the qualified-immunity inquiry: was the right they violated clearly established.

**2.      *Was the right clearly established?***

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. So the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Relevant case law existing at the time of the violation helps establish the boundaries of a clearly established right. "For a right to be clearly established, previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Hadley v. Gutierrez*, 526 F.3d at 1324, 1333 (11th Cir. 2008) (internal quotation marks omitted). Case law need not have "materially similar" facts to the case in question because "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But when the law is stated broadly and generally, "a very high degree of prior factual particularity may be necessary." *Id.* at 740-41.

The right here is not clearly established. To be sure, the Eleventh Circuit "has long recognized that supervisors are liable for the excessive force and the deliberate indifference of their employees where the supervisors received numerous reports of prior misconduct of that nature by those same employees and did nothing to remedy the situation." *Danley*, 540 F.3d at 1315. But the COTR Defendants are not the literal supervisors of the Contractor's detention officers, and those detention officers are not the employees of a COTR. As the Court observed when analyzing whether a *Bivens* cause of action exists, a COTR's duties and responsibilities approximate some traditional supervisor powers: for example, a COTR can effectively get a Contractor detention officer reassigned or fired. (*See* DE 100-1 at 38.) But the COTR must exercise this power by directing the Contractor to do it, which in turn means that the order will be carried out by a supervisory staff member employed by the Contractor. This underscores both that the Contractor is the employer of the detention officer (not the government), and that a detention officer's real supervisor is a Contractor employee. Moreover, much of what a COTR does likely bears little resemblance to what the Contractor supervisory employees do. And the

word *much* in the previous sentence probably understates the case. If the amount of time spent on various tasks for a COTR is proportional to the amount of lines devoted to them in the contract, then the COTR will spend most of his or her time "monitor[ing] all technical aspects of the contract, certify[ing] invoices for payment, and assist[ing] in administrating the contract." (DE 100-1 at 5.) In these circumstances then, it would make little sense to deprive a COTR of qualified immunity by analogizing to case law constructed around classic supervisor-supervisee relationships. The Court therefore holds that the right is not clearly established with respect to a COTR.

**CONCLUSION**

For the reasons set forth above, the Court concludes that the ICE Employees are entitled to qualified immunity. Accordingly, the Court **ORDERS** as follows:

1. The Individual Federal Defendants' Motion to Dismiss (DE 100) is **GRANTED**. With respect to these Defendants, the complaint is **DISMISSED**. Their alternative Motion for Summary Judgment (DE 100) is **DENIED as moot**.

2. The Motion for a Protective Order (DE 89) by the Private Defendants is **DENIED as moot.**

3. The Motion to Stay Discovery (DE 106) by the Individual Federal Defendants is **DENIED as moot**.

4. The Motion to Deny Summary Judgment (DE 115) by Francis is **DENIED as moot**.

**DONE and ORDERED** in chambers, at Miami, Florida, on March 29, 2013.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**